Michelle L. Gomez, Bar No. 41661037
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO   80202
Telephone:   303.629.6200
Facsimile:    303.629.0200
mgomez@littler.com
*Attorney for Defendant United Parcel Service, Inc.*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# MISSOULA DIVISION

| | |
|---|---|
| MICHAEL RYAN,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC.,<br><br>        Defendant. | Case No. 9:21-cv-00071-DWM<br><br>**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Rule 56 and Local Rule 56.1, Defendant United Parcel Service, Inc. ("UPS"), respectfully submits the following Statement of Undisputed Facts in support of its Motion for Summary Judgment:

**I.    PLAINTIFF'S EMPLOYMENT AT UPS.**

1.    UPS employed Plaintiff Michael Ryan starting in October 2007 in Missoula, Montana.  Mr. Ryan started out in the position of part-time union laborer unloading packages from package cars into outbound trailers.  Mr. Ryan was a union laborer for around thirteen months.  [Exhibit A (Deposition of Michael Ryan

1

("Ryan Dep."))[1] at 35:20-37:3.]

2.  After thirteen months, Mr. Ryan was promoted to a part-time preload supervisor, and approximately a year and a half after that, he became a part-time local sort supervisor. Mr. Ryan remained in the position of part-time local sort supervisor throughout the duration of his employment with UPS. [Exhibit A (Ryan Dep.) at 37:12-38:9.] Once he became a supervisor, Mr. Ryan was no longer a union member since federal labor law prohibits management-level employees from being part of a union or unionizing. [*Id.* at 42:4-7; *see also id.* at 42:22-24 (Mr. Ryan was a part-time employee the entire time he worked at UPS.).]

3.  As a part-time local sort supervisor, Mr. Ryan was responsible for hiring and discipline, including engaging in employee counseling and providing warnings to employees whose conduct warranted it, overseeing the production of the local sort, serving as the hazmat/hazardous materials/leading package responder, and overseeing international shipments and safety. [Exhibit A (Ryan Dep.) at 45:1-16, 48:7-50:2, 50:20-51:6; *see also* Exhibit B (Dep. Ex. 1); Dkt. No. 9, Plaintiff's Preliminary Pretrial Statement, at p. 2.]

4.  UPS's Code of Conduct provides contains a policy entitled, "Business Continuity Management and Workplace Violence Prevention." [Exhibit C

---

[1] A full-size version of the transcript can be filed in lieu of the condensed version if preferred.

(Declaration of Tim Schreiber ("Schreiber Decl.")) at ¶ 5; Exhibit C-2 (Dep. Ex. 2) at p. 22.] The policy states:

> UPS is committed to a safe work environment that is free of threats, intimidation, and physical harm. Everyone has a right to work in a safe environment and everyone shares the responsibility for ensuring the safety of others. We have zero tolerance for workplace violence, and we will investigate and take appropriate action up to and including dismissal regarding any threats to a safe workplace.
>
> UPS prohibits violent behavior in the workplace including, but not limited to, physical assaults, fighting, threatening comments, intimidation, threats through electronic communications including social media, and the intentional or reckless destruction of property of the company, employee, UPS representative, or customer. Comments or behavior that reasonably could be interpreted as intent to do harm to people or property will be considered a threat . . . .

5.  Mr. Ryan agrees that "[a]dherence to the Code is required of all employees and representatives of UPS" and "inappropriate physical contact" is not allowed in the workplace. [Exhibit A (Ryan Dep.) at 53:13-19, 54:21-56:2; *see also* Exhibit D (Dep. Ex. 3) (Mr. Ryan's acknowledgement of policies).]

6.  Mr. Ryan has "read at some point probably multiple times" the business continuity management and workplace violence prevention policy and understood the gist of it during his employment at UPS. [Exhibit A (Ryan Dep.) at 53:20-54:15.] Mr. Ryan is sure he took the workplace violence awareness management training. [*Id.* at 64:15-17.]

7. Mr. Ryan is sure he has raised his voice with employees, although not on a regular basis, admits he used curse words in the workplace, and admits that he would stand his ground when he felt an employee was being confrontational towards him. [Exhibit A (Ryan Dep.) at 74:11-14, 93:12-19, 95:9-96:7.]

## II. PLAINTIFF'S ALTERCATION WITH HIS SUBORDINATE CLAYTON SKAJA RESULTING IN THE TERMINATION OF HIS EMPLOYMENT DUE TO VIOLATION OF COMPANY POLICY.

8. Clayton ("Clay") Skaja was a union employee/local sort hourly employee the entire time Mr. Ryan worked with him, and Mr. Ryan was one of Mr. Skaja's supervisors as of August 17, 2020. [Exhibit A (Ryan Dep.) at 25:15-17, 26:18-23, 102:5-14; *see also* Exhibit E (Dep. Ex. 25) at p. 3, Response to Request for Admission No. 2; Exhibit F-1 at p. 13 (UPS (M. Ryan) 0000624).]

9. Mr. Ryan never received any complaints about Mr. Skaja being physical in the workplace. [Exhibit A (Ryan Dep.) at 32:6-9.]

10. In describing his relationship with Mr. Skaja, Mr. Ryan said, "Clay and I got along good, and this -- this is how the things happened with Clay. When – He would go along just be fine being nice to everyone else, nice to me, friendly, talk you know, and then about every six to eight weeks, then he would just turn into Dr. Jekyll – or Mr. Hyde, whichever is the bad guy. Then we would talk to him with a union steward, then we'd – I'd either write him up or verbally talk to him, 'cause you got to take the steps with UPS, verbal warning, written warning. So we'd do

that. And then he'd be fine for an X amount of time, then he did – would go right back to being angry all the time . . . ." [Exhibit A (Ryan Dep.) at 24:19-25:10.]

11. The evening of August 17, 2020, Mr. Ryan was relabeling bins with updated ZIP codes with a union employee, Jaeren Graham. [Exhibit A (Ryan Dep.) at 102:5-14.] A fellow part-time supervisor, Terry Cyr, was supposed to be at the corner of the building directing traffic as there was a blind spot with package cars coming in and out due to construction; at some point, Mr. Ryan heard Mr. Skaja yelling and Mr. Ryan went over to help clear up a traffic jam as Mr. Cyr had left his post. [Exhibit A (Ryan Dep.) at 102:15-104:13.]

12. After Mr. Ryan helped to clear up the traffic jam, Mr. Skaja got out of his car and yelled at Mr. Ryan as they were walking over to Mr. Ryan's makeshift desk. Mr. Skaja grabbed the paper cutter Mr. Ryan had been using and started walking towards Mr. Ryan. Mr. Ryan "want[ed] [his] paper cutter back," so as Mr. Skaja walked by him, Mr. Ryan grabbed the paper cutter and then touched Mr. Ryan's shoulder and then "immediately released it." Mr. Skaja kept walking and Mr. Ryan thought to himself, "[t]he hell with this." He followed Mr. Skaja across the building, at which point Mr. Skaja threw the paper cutter which slid across the cement floor and out the garage door. [Exhibit A (Ryan Dep.) at 104:22-106:0.]

13. Right after the altercation, Mr. Ryan called his immediate supervisor, On-Road Supervisor Wyatt Layman. [Exhibit A (Ryan Dep.) at 109:9-13.] Mr.

5

Layman showed up shortly thereafter as he lived just a short distance from UPS. [Exhibit A (Ryan Dep.) at 111:6-14.] Mr. Layman sent both Mr. Ryan and Mr. Skaja home due to conflicting stories, but Mr. Ryan did not bother asking about the nature of the conflict between the stories. [Exhibit A (Ryan Dep.) at 112:5-113:7; *see also* Exhibit F (Declaration of Clay Holloway ("Holloway Decl.") at ¶ 3, Exhibit F-2 at pp. 2-8 (Dep. Ex. 13); Exhibit A (Ryan Dep.) at 141:23-144:7.]

14. The following day, Mr. Ryan received a text message from Mr. Layman saying, "I'm going to need you here at 4:30." [Exhibit A (Ryan Dep.) at 114:1-7.] Mr. Ryan arrived early, and was told to go have a seat in the office of Business Manager Tim Schreiber. After a period of time, Mr. Ryan was called into the conference room. Present were Mr. Schreiber, Mr. Layman, UPS Geo Services (essentially HR Director) Kristine Irish (participating by phone), HR Specialist Shaniece Hoiland, and Corporate Security Investigator Clay Holloway (participating by phone). They discussed "what was going on," and during the meeting Ms. Hoiland was typing notes and created an unofficial transcript of the meeting. [Exhibit A (Ryan Dep.) at 145:15-25; *see also* Exhibit C (Schreiber Decl.) at ¶¶ 6-7; Exhibit C-3 (Dep. Ex. 14).]

15. Afterwards, Mr. Ryan was asked to return to Mr. Schreiber's office to write down his side of the story after which Mr. Layman took him outside so they could take a picture of where the paper cutter landed outside the garage door.

[Exhibit A (Ryan Dep.) at 114:14-116:4, 152:5-20; *see also* Exhibit F (Holloway Decl.) at ¶ 7, Exhibit F-2 at pp. 9-10 (Dep. Ex. 15).]

16. After the picture was taken, Mr. Ryan returned to the conference room and was advised by Ms. Irish that his employment was being terminated. Ms. Irish gave Mr. Ryan the option of voluntarily resigning, which he declined, and she also brought up how to dispute the termination through a process referred to as the employee dispute resolution program. Mr. Ryan then asked for UPS's "attorney's name, address, telephone number and email," at which point Ms. Irish asked Mr. Schreiber to escort Mr. Ryan out of the building. Mr. Ryan admits that he probably raised his voice during this meeting. [Exhibit A (Ryan Dep.) at 116:5-118:3, 140:16-141:9, 151:20-152:2, 181:25-182:11.]

17. Mr. Schreiber also decided to terminate Mr. Skaja's employment for destruction of UPS property and insubordination. [Exhibit C (Schreiber Decl.) at ¶ 11; Exhibit F-1 (Dep. Ex. 12); Exhibit G-3 (UPS (M. Ryan) 0001185); Exhibit A (Ryan Dep.) at 123:8-23.]

18. Mr. Ryan chose to commence litigation as opposed to going through the employee dispute resolution process, although he did receive the EDR request form when he received his final paycheck. [Exhibit A (Ryan Dep.) at 184:19-23, 191:19-21; Exhibit E (Dep. Ex. 25) at p. 31.]

### III. UPS CONDUCTED AN IN-DEPTH INVESTIGATION PRIOR TO THE DECISION TO TERMINATE MR. RYAN'S EMPLOYMENT

19. Clay Holloway was assigned the task of investigating the August 17, 2020 altercation. [Exhibit F (Holloway Decl.) at ¶ 3; Exhibit F-1 (Dep. Ex. 12).]

20. In connection with Mr. Holloway's investigation, he interviewed, in addition to Mr. Ryan, Carson Clarke, Terry Cyr, Isaac Earling, Jaeren Graham, Chase Hill, and Clay Skaja. [Exhibit F (Holloway Decl.) at ¶¶ 3-4; Exhibit F-2 (Dep. Exs. 13, 15, 16, 17, 18, 19, 20).] Mr. Ryan did not believe anyone else needed to be interviewed, *i.e.*, there were no other witnesses he could think of to provide additional information. [Exhibit A (Ryan Dep.) at 141:13-18.]

21. In summary, the witnesses explained as follows:

Carson Clarke – stated he witnessed Mr. Skaja take the paper cutter from Mr. Ryan and walk off with it. He could not see what happened next, but heard Mr. Skaja say "get your fu*king hands off of me." Exhibit F-2 at p. 12 (Dep. Ex. 17).

Terry Cyr – stated Mr. Ryan "violently accosted" Mr. Skaja and "grabbed him several times by the collar of his shirt and vest and arms to stop him" while "yelling at him." He saw Mr. Skaja break away from Mr. Ryan's "grip" and say "don't you dare touch me." Exhibit F-2 at p. 11 (Dep. Ex. 16).

Isaac Earling – stated he witnessed Mr. Skaja take a cutting board from Mr. Ryan and "I think [Ryan] tried to grab [Skaja] but [Skaja] yelled 'don't touch me or get your fu*king hands off me.'" Exhibit F-2 at p. 14 (Dep. Ex. 18).

Jaeren Graham – stated he heard Mr. Skaja say "keep your hands off of me" but could not see the altercation. Exhibit F-2 at p. 15 (Dep. Ex. 19).

Chase Hill – stated he witnessed Mr. Skaja walking away from Mr. Ryan and "saw him forcefully pull his arm away from [Ryan]. It looked like [Ryan]

grabbed [Skaja's] arm and [Skaja] tried to break from free his grip." He also thought he heard Mr. Skaja say "don't fu*king touch me" after he pulled his arm away. Exhibit F-2 at p. 17 (Dep. Ex. 20).

[Exhibit F (Holloway Decl.) at ¶ 4 and Exhibit F-2; *see also* Exhibit A (Ryan Dep.) at 130:10-19, 131:16-23 (for his part, Mr. Cyr said that he saw Mr. Ryan chase after Mr. Skaja and grab him by the collar and shoulder; while Mr. Ryan disagreed, he does not know why Mr. Cyr would lie); 128:5-129:14, 130:1-3; *see also id.* at 130:4-9 (Mr. Ryan acknowledges it was not impossible for Mr. Clarke to have seen some of the incident, and Mr. Clarke and Mr. Cyr consistently said that they both heard Mr. Skaja say "[g]et your fu*king hands off of me."); 164:2-9 (Mr. Ryan does not disagree with anything in Jaeren Graham's written statement).]

    22.    Mr. Ryan does not know why multiple employees would have said that Mr. Skaja was irritated with Mr. Ryan that evening, but admits that Mr. Skaja has been irritated with him in the past. [Exhibit A (Ryan Dep.) at 137:8-14; *see also id.* at 174:25-175:9 (Mr. Ryan may have complained previously that Mr. Skaja was lazy and incompetent); 177:9-20 (there was a time when Mr. Ryan was trying to leave work early, and he and Mr. Skaja were yelling and screaming at each other; Mr. Cyr told Mr. Ryan to go home and told Mr. Skaja to go back to work).] Moreover, Mr. Ryan acknowledges that Mr. Skaja may have gone to him once prior in the evening to ask for assistance in directing traffic at the blind spot. [*Id.* at 137:15-25.]

23. Mr. Ryan believes Mr. Skaja said "[g]et your fu*king hands off of me." He further admits he made contact with Mr. Skaja during the August 17th altercation, although he later contended it was to break a fall. [Exhibit A (Ryan Dep.) at 125:8-21, 129:19-21.] Notably, however, Mr. Ryan acknowledges that his handwritten statement nowhere mentioned that he only touched Mr. Skaja's bicep because he was falling. [*Id.* at 152:21-153:3.]

24. It never even crossed Mr. Ryan's mind to just let Mr. Skaja walk away with the paper cutter, but in hindsight, he wishes he had done so. [Exhibit A (Ryan Dep.) at 136:3-8.]

25. Based on the investigation conducted by Corporate Security Investigator Clay Holloway, in consultation with the human resources department and On-Road Supervisor Wyatt Layman, Mr. Schreiber agreed that there was no choice but to terminate the employment of Mr. Ryan for violating UPS's workplace violence prevention policy. Regardless of Mr. Ryan's intent or reasoning behind touching Mr. Skaja, Mr. Schreiber believed there was absolutely no justification for Mr. Ryan, a supervisor, to touch another employee.

26. Mr. Ryan agrees that Mr. Schreiber, Mr. Layman, and Ms. Irish received inconsistent statements regarding what occurred on August 17, 2020, and the only reason Mr. Ryan can come up with as to why they should not have listened to Mr. Clarke or Mr. Cyr is because of Mr. Ryan's "reputation." [Exhibit A (Ryan

Dep.) at 167:14-168:7.]

27. Mr. Ryan acknowledges that he has no reason to believe that Ms. Irish did not honestly believe that he had in fact grabbed Mr. Skaja. [Exhibit A (Ryan Dep.) at 180:21-181:24.]

**IV. MR. SKAJA'S EMPLOYMENT WAS REINSTATED PER THE UNION PROCESS, WHILE PLAINTIFF NEVER DISPUTED UPS'S DECISION TO TERMINATE HIS EMPLOYMENT**

28. While Mr. Skaja's employment was initially terminated for destruction of UPS property and insubordination, ultimately his employment was reinstated pursuant to the union grievance process. [Exhibit G (Declaration of Todd Gertz ("Gertz Decl".)) at ¶ 8; Exhibit G-2 (UPS (M. Ryan) 0001137) at p. 217 and 224; Exhibit A (Ryan Dep.) at 123:8-23.]

29. By way of background, UPS's union members in Montana, including Mr. Skaja, are subject to the terms of the National Master United Parcel Service Agreement and Western Region of Teamsters United Parcel Service Supplemental Agreement, which applies for the period August 1, 2018 through July 31, 2023, and covers eleven western states including Montana (the "Western Supplement"). [Exhibit G (Gertz Decl.)) at ¶¶ 3-4; Exhibit G-1 (UPS (M. Ryan) 0000937); Exhibit G-2 (UPS M. Ryan) 0001137).]

30. The Western Supplement sets forth the Grievance Procedure at Article 28, which governs "all disputes, alleged contractual violations and grievances" with

the intention of addressing each in a timely manner. [Exhibit G-2 at p. 217.] As set forth at Article 28 Section 2, there is a specific process for handling discharges of union members. [Exhibit G-2 at p. 224.]

31. Section 2 specifically provides that no union employee "shall suffer . . . discharge without the employee(s) having been given a written warning notice . . . ." [Exhibit G-2 at p. 224.] However, no warning letter is needed in the case of "willful, wanton or malicious damage to the Employer's property," as such is a "dischargeable offense[] without the necessity of a warning letter being in effect." [*Id.*]

32. On August 21, 2020 letter, Mr. Schreiber sent a letter to Mr. Skaja stating that Mr. Skaja's employment was "terminated under Article 28, Section 2(a)(7) of the Western Regional Supplemental Agreement for willful, wanton or malicious damage to the Employer's property" based on his admission to taking a UPS paper cutter and throwing it under a belt and out a bay door resulting in damage to the paper cutter. [Exhibit G, Gertz Decl., at ¶ 6; Exhibit G-3 (UPS (M. Ryan) 0001185).]

33. Per the terms of the Western Supplement, Mr. Skaja could file a grievance regarding his discharge [Exhibit G-2 at p. 225], and he did so on August 24, 2020. [Exhibit G, Gertz Decl., at ¶ 7; Exhibit G-4 (UPS (M. Ryan) 00011186).]

34. On September 23, 2020, a settlement was reached between the local union and UPS, whereby it was agreed that Mr. Skaja's employment would be reinstated (with no back-pay and time served as suspension) as it was determined, after reviewing the written statements collected during the investigation, that Michael Ryan, a supervisor, did in fact make physical contact and grab Mr. Skaja on the day in question. [Exhibit G, Gertz Decl., at ¶ 8; Exhibit G-5 (UPS (M. Ryan) 0001187).]

35. Mr. Ryan, as a non-union member supervisor, did not have the ability to file a grievance regarding his termination of employment per the terms of the Western Supplement. [Exhibit G, Gertz Decl., at ¶ 9.]

36. For his part, Mr. Ryan acknowledges that it is "very, very hard to fully and completely terminate a union employee at UPS . . . ." [Exhibit A (Ryan Dep.) at 124:3-13.]

Dated this 3rd day of March, 2022.

                                                  */s/ Michelle L. Gomez*
                                                  Michelle L. Gomez

                                                  LITTLER MENDELSON, P.C.
                                                  *Attorney for Defendant United Parcel Service, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of March, 2022, a true and correct copy of the foregoing was filed and served via CM/ECF which will send a copy to the following:

Torrance L. Coburn
TIPP COBURN & ASSOCIATES PC
2200 Brooks Street
P.O. Box 3778
Missoula, MT   59806-3778
Telephone: 406.549.5186
torrance@tcsattorneys.com

*Attorney for Plaintiff*

*s/ Michelle L. Gomez*
Michelle L. Gomez

4882-3603-1762.1 / 110830-1012